Good morning, Your Honors. Vince Chabria, Deputy City Attorney, appearing for the City and County of San Francisco. I'm appearing with Scott Cronlund from the Altshuler-Burzon firm. In terms of handling our time, I would like to take 20 minutes, and then Mr. Cronlund would like to take 5 minutes, and then if we may, I'd like to reserve 5 minutes for rebuttal. All right. Try to keep track of your time, and if I remember, I'll try to help, but it's your primary responsibility. Very good, Your Honor. I'd like to begin, if I may, by addressing the argument that's gained newfound prominence in this litigation, and that's the argument that compliance with the HCSO through the government payment option itself involves the creation of an ERISA plan. And the argument seems to be as follows. When an employer purchases health insurance for its employees, that involves the creation of an ERISA plan, and regular payments by the employer to an insurance company should be treated no differently from regular payments by the employer to the city. The consequence being, of course, that government entitlement programs like the HAP would be subjected to ERISA's regulatory regime. But there's a fundamental distinction between the two types of arrangements. The difference is embodied in ERISA's statutory language itself, as well as the purposes, and the difference, we think, underscores why the government payment option should not be construed as creating an ERISA plan. And I'd like to start by going back to the actual statutory language, if I may, because although the definition of employee welfare benefit plan is unclear in many respects, there's one thing about the definition that I think is quite clear, and that is that an ERISA plan has to involve the provision of benefits by the employer. To quote the actual language of 29 U.S.C. section 1002 sub 1, an ERISA plan involves, quote, a plan established or maintained by an employer for the purpose of providing benefits, unquote. Now in the private insurance context, the employer is providing benefits to its employees through an agent, the insurance company. The employer enters into a contractual arrangement with the insurance company. The contract specifies the benefits that are to be provided, and the insurance company is obligated to the employer to make sure that the employer's benefits promises to its employees are kept. In contrast, with the government payment option, there simply is no provision of benefits by the employer. Suppose an employer said to the employees, we're going to give $1,000 worth of benefits to you, $1,000 a month, and it made a contract with an insurance company and said to it, we're going to pay you $1,000 per employee a month, and you give them $1,000 worth of medical benefits. Would that be an ERISA plan? I think that it would be a much closer case because, again, the employer has entered into a contractual arrangement with the insurance company, and the employer has made a benefits promise, in essence, to its employees. Whereas here, the city is not acting as an agent of the employer. It's entirely within the discretion of the city to decide what benefits to provide. The city is under no obligation to the employer to ensure that whatever benefits promises the employer has made are kept. With the government payment option, the employer is simply saying to the employee, we're going to make a payment to the city, and under city law, not under our policies or program, but under city law, that will entitle you to a discount in participation in the city's program. So we have no involvement. We haven't made any choices about what that program entails. We have no involvement in its composition, but the city will be contacting you shortly. And that simply doesn't involve the provision of benefits. Is your argument that it's essential to a plan being an ERISA plan that the plan be established by the employer, not merely that the employer's act result in some benefits down the road, but rather that the plan be established by the employer? By the employer for the purpose of providing benefits. So for example... So the reason I'm asking it this way is the way the system works under the ordinance, it appears to me that the pay-in or the write-a-check option, if that's what the employer decides to do, does in fact result in some benefit flowing to the employee. That is to say, they get a discount. That's correct. So the question is not, or at least under your argument, cannot be, well, if there's some benefit flowing to the employee as a result of the employer's action, that's an ERISA plan. The question has to be, if we're going to accept your argument, well, did the employer set up a plan? That's exactly right. And Marash, the Supreme Court's decision in Marash, exemplifies the point we're making because, of course, in that case, when an employer endeavors to provide vacation pay to its employees, that results in a benefit being received by the employees. But it doesn't involve the creation of an ERISA plan. And the reason, of course, is that certainly the employer must set up some sort of administrative scheme in order to provide vacation benefits. But in that instance, even though the employee is receiving benefits, an ERISA plan has not been created because the employee doesn't incur a risk that's different in kind from the risk that is incurred in connection with the payment of wages. How strenuously was this argument pushed by the Golden Gate parties at the district court? I think it's fair to describe the argument made at the district court as an afterthought. Well, the district court specifically considered this argument, and it rejected it, but it ruled on it, didn't it? That's correct. And during the hearing in the district court, the court asked questions specifically about it, and GGRI did get an opportunity to further articulate its position, even though it had not done so to a great extent in the briefs. So we don't contend, certainly, that the argument has been waived or anything. Well, it's fair to describe it as it was not one of the major arguments presented, but it was fully considered by the district court. Absolutely, Your Honor. And the court stated specifically that it didn't consider the HAP arrangement to constitute an ERISA plan in its order. So, as I said... Let me ask you this, just to get a sense of the order of argument that you've anticipated and where I should direct this question. At some point, I'd like either you or your co-counsel to address the, as I'll call it, the fielder question. That is to say, is this somehow a coercive plan such that, as a practical matter, the employers have no choice but to enter into or change their existing ERISA plans? Whether that goes to you or to Mr. Cronlund, that's up to you. And just to be clear, I'm prepared to answer any question as is Mr. Cronlund, so I'll go ahead and address that right now. In Fielder, of course, the court held that there was no reasonable non-ERISA means for complying with the ordinance, because the quote-unquote government payment option in that case amounted to a penalty. Because, and this follows up on Judge Reinhart's question, the employees of Walmart would not receive any benefit of any kind if Walmart paid into Maryland's Medicaid system. Or rather, they wouldn't receive any benefits other than what they were already receiving under Medicaid. If they qualified for Medicaid. That's what I mean. That is to say, whatever benefits were coming from the state of Maryland to some of the Walmart employees would remain absolutely constant, and the number of employees at Walmart benefited by the plan would remain absolutely constant. That's correct, and there would be no benefit above and beyond what they would otherwise be entitled to under state law to the extent they did qualify. That, of course, is the key distinction between this case and Fielder, and what the court held in Fielder, and we don't think that this court has any cause to disturb that holding in this case, is that because there was no reasonable non-ERISA means for complying with the law, it did effectively force employers, Walmart in that case, or if it had been a broader rule, other employers, it did effectively force them to adopt ERISA plans or alter their existing ERISA plans, and that would, of course, have interfered with plan uniformity across jurisdictions because ERISA employers would have had to alter their actual ERISA plans to comply with various spending requirements across jurisdictions. Here, of course, the existence of a reasonable non-ERISA compliance alternative makes all the difference in the world because an employer in San Francisco, a multi-jurisdictional employer in San Francisco, does not have to change its plan nationwide. It does not have to adopt a different plan in San Francisco to comply with the ordinance. It does not have to administer its existing plan any differently from how it does in other jurisdictions in order to comply with the ordinance. At most, what can be said about the effect of the ordinance is that it may impose some indirect economic incentive on an employer to change the terms of the plan, and, of course, the employer looks to any plan expenditures that it may have made to determine whether it's in compliance with the ordinance. But as this Court has made clear in WSB and is clear from the Supreme Court cases like Travelers and Dillingham and De Buono, that kind of incentive and that kind of review of plan expenditures is far from sufficient to establish preemption. I understand your point that, on the fact, Fielder is sufficiently different from the ordinance at issue here. Nonetheless, I'd like to ask you whether you care to take a position as to whether Fielder is correctly decided. Obviously, it was a 2-1 decision. We've got a dissent. Do you take a position as to whether Fielder is right on the facts of Fielder? I think Fielder was probably wrongly decided and that Judge Michael's dissent was a better application of ERISA preemption precedent because it's really a factual question. It's not a legal question. I think that both the dissent and the majority in Fielder agreed basically on what the law was, and Judge Michael simply concluded that on the facts of that case, it might very well be reasonable for Wal-Mart to decide to comply with the law by... I looked pretty hard in his dissent for any argument as to why it might be reasonable for Wal-Mart to do that, and I didn't see that argument. I saw him say that Wal-Mart had a choice, but I didn't see any developed argument as to why it was realistically a choice that Wal-Mart would make. In that case, the law required the employer to pay, to provide, to make health care expenditures of 8% of its payroll, if I remember correctly. It may be that if the employer makes expenditures of very close to 8% of its payroll and it has a few employees who don't qualify, who don't participate in the ERISA plan, it may be more reasonable for the employer to make payments to the state on behalf of those few employees. I don't know how far we need to pursue it, but that argument that you're now making seems to me to buy into the rationale of the majority in Fielder, and you're just arguing the facts, saying that the facts could be different. Well, I think that's right. Again, Your Honor, it's... But then we're back to where you were to begin with, which is to say you're saying the facts of this ordinance are sufficiently different that Fielder doesn't control. That's exactly right. And I'd actually like to make one more point about that, and it also responds, Your Honor, to the uniformity question, which is that the other side raises the specter of ordinances like this, spending requirements like this, popping up all over the country. And it cites a number of, quote-unquote, taxpayer pay laws that have been introduced in various state legislatures. But Your Honor's question about Fielder sort of underscores the difference between this ordinance and those types of laws, and suggests that there may not be such great concern about whether ordinances similar to this one will pop up all over the country. Remember, this is the health access program that is funded primarily by city taxpayer dollars. In order to provide a reasonable non-ERISA compliance option for employers, the city has created a comprehensive government health program funded primarily by taxpayer dollars to provide health care to all its uninsured residents. The city has really stepped up to the plate here. And I don't think it's fair to assume, just as a factual matter, that this ordinance can be emulated by numerous other jurisdictions, because especially in these times of the budget crisis... That doesn't seem like a very good reason to uphold the plan. You know, it seems to me you have to assume that if we say this plan is proper, that other jurisdictions could adopt it. And whether they actually do now or do in the future, once you say it's a valid plan, others are free to adopt it. I don't think we should uphold it on the basis that, well, only San Francisco is good enough to provide this kind of benefit. No, I agree with that, Your Honor. And the point I was just trying to make is that there is a significant distinction between the kind of law that San Francisco has enacted and the kinds of pay-or-pay laws that the other side is referring to. And a ruling upholding this one doesn't necessarily open the door to those. But the main point, Your Honor, is that the case law has made clear that the kind of expenditure disuniformity that the other side is complaining about is not the kind of disuniformity that ERISA's preemption provision was concerned with. The law makes clear that even in the case... Frankly, the structure of ERISA shows that even in the case of health care expenditures, there will be differing health care expenditures throughout the country as a result of ERISA's savings clause. And the Fort Halifax case shows that in the area of severance pay, there will be differing expenditure requirements in that area across the country. And, in fact, there are. The Morash case shows that there will be differing expenditure requirements in the area of vacation pay, another area mentioned by ERISA. Travelers in Dillingham and Dubuono show that economic incentives can be placed on ERISA plans that will lead to different expenditures in different jurisdictions. But that's not the kind of uniformity that ERISA's preemption provision is concerned with. ERISA's preemption provision is concerned with allowing employers to maintain plan uniformity. And, as I stated and as we've set forth in our briefs, a San Francisco employer who has a multi-jurisdictional plan does not have to change that plan in order to comply with the ordinance. Going back just very briefly to the government payment option, I want to make a couple more points about that, if I may. It's true that this ordinance is about health care and the law at issue in Morash was about vacation pay. But if you look at the government payment option and you compare what the employer does to comply through the government payment option and what the employer does in Morash, it's actually quite similar. In Morash, payment was made out of the employer's general assets on a regular basis to employees and then the employer's obligation was done. And for that reason, it's like a payroll practice. And for that reason, the employee is not incurring additional risks beyond the risks associated with not getting paid wages in exchange for your work. Similarly here, from the perspective of the employer, which is after all what ERISA is concerned about, the employer simply makes payments regularly out of its general assets to the city and then the employer's involvement is done. Aside from, of course, keeping records. And so I would argue that the government payment option is much more like vacation pay. It's much more like a payroll practice. In fact, the employer can make payments to the city concurrent with its payroll, its regular pay periods. It's much more like a payroll practice and does not raise a danger, or to use the words of Morash, doesn't raise the danger of defeated expectations beyond that of non-payment of wages. So that's another hallmark of an ERISA plan that I think doesn't exist here. Finally and most fundamentally, as we stated in our briefing, I won't belabor it too much, ERISA was enacted to protect, to ensure that employers' benefits promises to employees were kept. And here there's no benefits promise by the employer to the employee. The employer has no control over the benefits that are provided. That is something that's entirely within the city's control. The purpose of ERISA was not to regulate government entitlement programs like the HAP. To the contrary, as we've explained in our brief, Congress went out of its way to avoid regulating such programs in 1974 when it enacted ERISA. It was concerned with the mismanagement of employee benefits by employers or their agents. And so for that reason, none of the concerns implicated by ERISA are invoked by the government payment option. And again, that leaves the other side arguing that notwithstanding the existence of a reasonable non-ERISA means for complying with the ordinance, it's still somehow preempted. But they have not explained how it would require them to operate their plans differently in different jurisdictions given the existence of this requirement. With that, I'll turn it over to Mr. Cronlund, the President of the Balance, for rebuttal. Good morning. I'm Scott Cronlund, appearing for the Union Appellants. I really have only one point to add to Mr. Chabry's presentation, and that's to address Judge Fletcher's question about the Riley v. Fielder case. In Travelers, in Dillingham, in De Buono, the Supreme Court said that there could be an economic incentive so strong as to effectively dictate the choices of plans and plan sponsors, and that when you have an economic incentive that strong, you may have preemption. But that in those cases, the showing hadn't been made that the economic incentive was so strong as to dictate choices. And it seems that the majority in Fielder found that the showing had been made. The majority felt that the spending requirement in that case was essentially a civil penalty against Walmart, that everyone knew Walmart would change its ERISA plan, that that was the intent of the legislature, and whether one agrees with the majority's effort to look at what it considered to be the true motivation of the statute in Fielder or agrees with the dissent, we certainly don't have that showing in this case. We don't have the showing that the HAP creates an economic incentive that dictates choices. In fact, we have a showing that the government payment option is actually a very reasonable option for employers, and that's really the difference between this case and Fielder and why it's not necessary to decide whether the majority or dissent in Fielder was correct. Unless the Court has further questions. Do you need to show under this line of travelers, Fielder, I'll abbreviate it that way, that it's not coercive in the Fielder sense for all possible employers within the city of San Francisco, or do you nearly need to show it for most? I mean, I don't see numbers broken out by the parties on either side as to, okay, here's this employer with this situation, here's this employer with that situation. I don't see a lot of numbers from either side, so I'm having trouble figuring out whether, okay, are all the employers in a situation where it's quite reasonable to do, just to write a check, or only some? I can't quite tell. Well, I think there are two responses. One is that this is a case with a presumption. It's a presumption that Congress didn't intend to displace the powers of the states, and what the Supreme Court had said in Travelers, Dillingham, and De Buono was that the challengers didn't make a showing that the economic incentive was such as to dictate choices. So the Supreme Court didn't have to get into the issue of what a sufficient showing would have been, whether it would be in the aggregate or individually. There were no doubt some plans whose decisions would be altered by the laws that were at issue in Travelers, Dillingham, and De Buono. It's always possible to find some example. In this case, there certainly hasn't been a showing, so we really don't have to get into the issue. It's clear which way the presumption goes. It's a presumption against preemption, and there hasn't been a showing for an individual employer or employers in the aggregate. However, if one looks at the apprenticeship requirements in Dillingham, at the tax that was at issue in De Buono, at the surcharges that were at issue in Travelers, those were certainly going to affect choices that were made by plans. But they didn't make the showing that it was going to dictate those choices. And again, that's what we have here. We don't have a showing that the incentive is going to dictate choices. We have a reasonable non-ERISA option. Thank you, counsel. Thank you. Good morning, Your Honors. I am Curtis Cole. With me is Mr. Richard Rybicki. We represent the plaintiffs and respondent, Golden Gate Restaurant Association. I'd like to cede ten minutes of my time to the United States Department of Labor, represented by Mr. Edward Seeger. Counsel, same admonition. You're responsible for keeping track of the time, but I will try to do so with you if I remember. I thank you, Your Honor. I have two clocks staring at me. I'll try to keep my eyes on both of them. Well, lawyers tend to ignore the clocks when they get excited about the argument. I'd like to address the larger question of where we go from here. The court has given the parties its wisdom, and the parties have responded with further briefing. But the context of this case is momentous. We're talking, as the city and the interveners would have it, about universal health care. And it's to the city's credit that it has attempted to tackle that problem that's being debated now nationally. We're also talking about employer versus governmental funding, which is also part of that larger national debate. And finally, another momentous element of this particular case is state versus federal initiatives. I submit that all of those are wrapped up in this particular case, but more importantly, I submit that your ruling on ERISA preemption analysis will indeed guide the rest of the country, that there's reason for you to pause and ask the health care security ordinance that San Francisco has passed. Will it be followed by other cities, and in what way will it be followed? To repeat, the city is to be lauded for the health access program, the Healthy San Franciscans program. There is a severability clause in the ordinance, and it makes it very, very clear that we can focus upon the minimum spending requirement here, which I'm going to refer to for purposes of our discussion today as the health care security ordinance, or the minimum spending requirement. It is not necessary in ruling on preemption analysis that this court reject the HAP, so-called, the health access program, Healthy San Francisco. That can continue to exist, that will continue to exist, as your Honor's questions, both at the previous argument and today, have suggested. The real question, rather, is the approach of the ordinance to overcoming ERISA preemption. You've been told by both the city and the intervener, in their briefs, as well as during the previous oral argument, that they modeled the ordinance on this court's ERISA preemption analysis. Indeed, I recall a remark, as I listened to the recording, about the good fortune that they had to be able to rely upon the WSB case. At the end of the day, they've captured it accurately. They've built an ordinance around ERISA preemption analysis by courts, and the problem with that is that the courts have been complaining about the difficulties they have had with applying Section 514A of ERISA. I'm an appellate specialist. I recognize and sympathize with the court's concerns as expressed, not only by the United States Supreme Court and other circuits, but by this court. I look at a variety of tests. I look at your opinion, which identifies a number of tests. I look at complaints about the way in which Congress wrote, in such an expansive fashion, the preemption clause. And I would offer another observation. Congress didn't make it entirely clear, even in the body of ERISA, how it would have intended the very issue with which we're confronted here today to be addressed. So the courts have made the best of it in coming up with a variety of tests, the relationship test, the holistic test, the simplified test, and so on and so forth. But are we getting matters backwards if we take the difficulty the judiciary is having with a question essentially of statutory interpretation and turning that into the solution of the question of how to approach universal health care? Make no doubt about it. The city and the interveners have virtually bragged to you that they built this ordinance around your discussion of how we should approach ERISA preemption. Well, let me ask you this. Are you saying that they got it right, given WSB, and your quarrel is with WSB? Yes, Your Honor, we do quarrel with WSB. We quarrel with the way in which it's been applied. But at the end of the day, this court has spoken now in employee staffing, then again in WSB, and most recently in its opinion on the order granting stay. And what I wanted to do was cause the court to transcend that particular discussion and focus rather upon the larger issue, not of ERISA necessarily of how the court should address ERISA preemption, but rather should we be concerned about a loophole? But the question really is, if that's the argument, where does that leave us with respect to WSB? What should we do? Say it's wrong? Say we should go off in a different direction? Quite frankly, my suggestion to the court would be to focus upon congressional intent. But we still have to deal with cases. Yes, you do. And what do we do about WSB? For the reasons identified in our brief, we reject the way in which this court has applied WSB to uphold this particular statute. Your Honors, I'd hoped not to lose all of my time today discussing ERISA preemption. I'm afraid it's my own mistake by jumping into it and emphasizing the fact that this ordinance is built around it. Well, you know, I think we might be willing to give you a little extra time. It's an important case, and we won't hold you to the limits. We'll give the other side an equal amount. Your Honor, I would in particular like to focus now, if I can, upon the question that you raised just a moment ago to Mr. Chabria, which came up as well in the previous argument and frankly occurred to me the moment I looked at this ordinance, which is that the health care security ordinance creates a very strong incentive for employers to drop health care coverage. That's the dimension I'd like to focus upon today. As I understand it, that corresponds to the concerns that were expressed by the mayor's office when the ordinance was announced about employer droppage. You may recall seeing that in the record. We're all concerned about that, and the city has made it clear to you that they, at the end of the day, don't really anticipate that employers will be dropping their ERISA plans to shift into the city's plan. Rather, this is simply to pick up the uninsured and underinsured employed citizens of San Francisco. Well, be it. Let me understand where this argument may be going. You're arguing that, in fact, the incentives may be such that under this ordinance, the likely outcome may well be that the employers will prefer to write a check rather than even to retain their existing ERISA plans. There are some employers who will be tempted to do so. I suspect that large employers, as the Fielder court identified, such as Walmart, will look upon that alternative as nothing realistic. But I can imagine that smaller employers would legitimately look at it, which is precisely the reason for the question. Regardless, whatever you do in this particular case, as you've already acknowledged, will be followed elsewhere. Other ordinances don't have to follow this. I think you can sense where I'm going with this question as to where you are going. If it's true that there is a realistic possibility that a significant number of employers covered by this ordinance will prefer to write a check rather than to establish an ERISA plan, or perhaps even will prefer to write a check and to abandon their existing ERISA plans, that strikes me that that's basically giving away the Fielder argument. That is to say, there is no coercion upon the employers to establish an ERISA plan. Quite the opposite. Your Honor, there are different aspects of the Fielder decision with which we agree. One thing that I will agree with you on is that there was, first, a dissent to that opinion. Secondly, the particular statute in that case is easily distinguishable from this one in terms of the fact that it was focused upon a single employer. Third, there was a factual record in that case, as your questions have revealed to my opponent, and there isn't in this particular case, where I think that personally this leads us, as the Court's own question to my opponent's at the previous argument, is it relevant what the practical consequences are likely to be where you don't actually have a factual record? And I think the answer to that question is yes. You ask can we do that, and I think that you can. I think that you can look at a statute, in this instance an ordinance, and draw conclusions as to what rational employers are likely to do. In the Fielder Court, they concluded that Wal-Mart, as a rational employer, is not likely to go in a particular path, but here I sense, and I would agree, that it's conceivable a rational employer would look at the ordinance and avail itself of that particular option. The irony is that the city and the intervener say that's not likely to happen. Out of the other side of their mouths, they say, but these are attractive options that we offer to employers. They're trying to have it both ways. And the reason, of course, is because what they're really interested in doing is providing some additional funding for the universal health plan and want employers to contribute to it, but they also want employers to remain in their ERISA plans. I, quite frankly, am a little surprised at the emphasis that you heard in the last oral argument, and you saw throughout their briefs, about how attractive this option is to employers, but I leave it at that. The city and the interveners themselves have urged you to view this as an attractive option, the implication being that one or more employers will avail themselves of that option. And finally, Your Honor, I recall... Let me go back to ask you about this issue. Are we supposed to draw an instance as a matter of law as to what employers are likely to do, or is this a matter that you should establish by presenting evidence to the district court? I think that given, ideally, it would be great to have a survey of San Francisco employers and identify what they plan to do. That doesn't exist in the record, and I will concede that to Your Honor. However, this statute is written in such a way that I think you can apply your common sense. Look at this from a larger perspective and realize that the fact that it's been characterized as attractive, that you asked your own question of the city and interveners as to the strong incentive that's been provided, and draw conclusions from that. Don't suspend your common sense in evaluating this ordinance. And common sense tells us that it will drive ERISA plans out of business? That employers will drop their ERISA plans? I don't think you can conclude, Your Honor, that it will drive ERISA plans, excuse me, out of business. That may have been a slightly hyperbolic statement. It may well have been. But is that basically the argument that we should conclude from our own knowledge that employers are likely, a substantial number, are likely to drop their ERISA plans? Yes, and that's because it's all too evident that there's a strong incentive for employers to do so in the way in which the plan was constructed and, more importantly, the way in which it was described to you as well as to the district court in this particular case. I don't think you can ignore that and assume, as the city would have you do, that while employers will leave their employees in ERISA plans, they really won't avail themselves of this particular aspect of the ordinance, which, of course, is to provide the uninsured and underinsured employees of San Francisco care. Why isn't it more likely that they would spend their money, instead of giving it to the city, on improving their own plans? Your Honor, that prompts me to respond that I can imagine a circumstance where an employer might well be able to reduce its overall health care costs by shifting to the plan. But you can imagine the converse as well, depending upon the amount per hour that's charged to the employer. That's the point. You can imagine both. You can. How do we know? You say use our own sense. Well, it could go either way, you say. It could go either way. You know, we're just supposedly judges. We're not experts in this field. And you'd ask us to make that determination as to what the employers are likely to do. No, I'm not. I'm asking you to recognize that those employers who can compute that their cost per hour is above $1.76 have a strong incentive to consider reducing their costs. By the same token, I think you can easily conclude that those employers who've worked hard by providing health care benefits to their employees and urging them to not smoke and all of those other kinds of activities and who succeeded in reducing in a given year their costs below that $1.76 per hour might well think, what's the point of the effort if I'm going to have to pay $1.76 anyway? I'm having trouble figuring out how this discussion we're having fits into the legal structure that we're supposed to apply. I understand Fielder. Fielder says that if the consequence of the statute or the ordinance is inescapably or as a practical matter inevitably going to require the employer or coerce the employer into setting up an ERISA plan, that is preempted by ERISA. That I got. But you're not arguing that that's happening. To the extent that you've got a thrust to your argument, it seems to be that it's going in the opposite direction. Now I have to say that any choice plan that is a true choice will in fact, I guess, result in some people choosing one and some people choosing the other, which is quite different from coercion. Why is it preempted by ERISA if some employers will choose one option, that is to say simply writing a check to the city, and other employers will find it more attractive to set up an ERISA plan, keep their ERISA plan, or increase their contributions to the ERISA plan? So once there's a choice, how is that invalid under Fielder or anything else? To answer that question, Your Honor, as I wanted to, again from the larger perspective, I've tried to establish that I believe this ordinance creates a loophole, and that was the only point I was trying to make, rather than your drawing conclusions about where the San Francisco ordinance would go. My larger point about why this ordinance is preempted is quite simply that it deprives San Francisco employers of the autonomy that is the fundamental assumption of ERISA. As I see it, ERISA, although I didn't expressly state it, has a feature that allows to employers the right to decide whether and how they provide health care benefits to their employees. That fundamental assumption of ERISA reflects, frankly, an answer to the question that you drew in your conclusion to your opinion in the matter of the state previously here, which is, if I can quote, there may be better ways to provide health care than to require private employers to flip the bill. That, I'm sure you meant to refer to universal health care, but the fact of the matter is Congress recognized that by the early 70s, employers were often, and if not usually, the way to provide health care to employees. Employers did flip the bill, and the choice that Congress made was to allow employers, when it came to welfare benefit plans to health care, to have the decision whether or not to provide it at all, and how to provide it. There are three features to this particular ordinance that contradict that. First, this ordinance requires employers to pay a fixed amount for health care coverage for their employees. That means that all employers have to provide health care coverage to their employees. That deprives an employer, as was in existence because of ERISA, the opportunity not to choose to do so. There are employers, in the Fielder case and others, this too, demonstrate who are choosing to provide benefits to full-time employees, but not to part-time employees. And this ordinance, second feature, is to deprive employers of that opportunity as well. Finally, ERISA allows and was engineered to give to employers the discretion to determine whether they were to give identical health care benefits to all employees. Is your argument that ERISA preempts the field of providing health care and that ERISA said health care may be provided by employers however they want, either can or may or may not, but that the city or the state can't have their own health care plans, that that's a matter of federal jurisdiction exclusively? No, that is not my position. I think the implication of that is that you would have to preempt as well the health access program of San Francisco. Not at all. It's absolutely within San Francisco's right to create the health access program. The focus of my argument is strictly on sections 14.2, 3, and 4 of the health care security ordinance, which contain the minimum spending requirement. I ask you to look at the minimum spending requirement, not from the small details that have been discussed so far, but rather from the overall impact upon an employer. That ordinance tells an employer to pay a fixed amount per year for all of its health care. The fact that the city offers an option, quite frankly, doesn't change that. That's my position. The second point is that it requires that that fixed amount be applied to every employee hour, which means, of course, that the employers have to pay for part-time employees. We know that. We know that's the purpose of this particular ordinance. You're told that in the briefs. ERISA doesn't require that. It's my point that the fundamental assumption of ERISA, I suspect we all know, is that employers have a choice. When the city sets up universal health care, it needs to look to a way other than affecting employer choices with regard to their ERISA plans. It needs to look to another device, and quite frankly, I don't think it has the power to direct employers to pay a fixed amount for their health care. And the same would be true with regard to providing coverage to their uninsured employees and so forth. Thank you, counsel. All right, we'll give the government ten minutes. And then, counsel, you'll have ten minutes plus whatever. We'll figure it out later. OK. Good morning, Your Honors. I'm Edward Seeger, representing the Secretary of Labor. The Secretary's position is that ERISA preempts the employer spending requirements in the San Francisco law for two separate reasons. First, employers cannot comply with those requirements except through establishing or maintaining an ERISA plan. And second, even if a plan was not required, the law impermissibly interferes with employers' ability to sponsor and administer uniform plans. I'd like to start with the first point on the plan issue. Judging from the oral argument here and the party's briefs, there's no serious dispute that most of the options for complying with the employer spending requirement involve ERISA plans. The only one that is at dispute right now is the city payment option. But that option also requires an ERISA plan because it requires employer conduct that falls squarely in the definition of employee welfare benefit plan under ERISA.  Now, you're saying that the city's HAP is an ERISA plan. No, Your Honor. Absolutely not. The definition of employee welfare benefit plan focuses on employer conduct. It says any plan, program, or fund established or maintained by an employer. So you have to look at what the employer's doing. It's just like the analogy to the insurance. OK, so the HAP is not an ERISA plan. That's correct. So what is an ERISA plan, then? It's what the employer establishes for its employees. I know, but what in this case is an ERISA plan? Because you're somehow arguing that payment into the city is resulting in an ERISA plan. Yes, it's the... So what's the plan, then, if it's not HAP? The employer picking the city payment option, sending the money into the city, and the city having its rules or whatever for employees getting benefits through the city's program. And that's really... I think you just described HAP. No, no, I'm focusing on the employer level. Maybe I'll try to give the analogy again to the insurance situation. When the employer purchases insurance for its employees, it's not making the insurance company an ERISA plan. The insurance company is just a provider of the benefits, and there are other providers out there like HMOs, the MIWAs, multi-employer welfare arrangements, and things like that. They're not necessarily ERISA plans, but when the employer sets up the arrangement and you have the ongoing administrative scheme and you have the discretion, which I think is a necessary part of providing... Yeah, but the employee didn't set up the arrangement. The city set up the arrangement, and the only contribution of the employer is either $1.17 or $1.76 an hour. Write a check, and the employer's... That's the beginning and the end of the employer's relationship to what the city does. I think there's more to that. The employer can make a choice whether it's going to do that option or something else. Well, of course. And what Your Honor is describing is the same thing that an employer can do with an insurance company. But there's no contractual relationship between the employer and the city, unlike the case where there obviously is a contractual arrangement between the employer and the insurance company, which then does result in an ERISA plan. That's correct, Your Honor, but the language of ERISA says established or maintained. It does not say established or maintained through a contract. The Supreme Court in Fort Halifax said that if a city or state requires an employer to do something that amounts to a plan, that is a plan, an ERISA plan. Yes, and as I'm sure you know, I can't remember the names, the Secretary of Labor was involved in the Fielder case. That's correct, Your Honor. Did the Secretary of Labor in that case make an argument analogous to the argument you're now making? Not on the plan issue, because the Maryland law in the Fielder case was not set up the same way with something corresponding to the Healthy San Francisco program. And what would be a relevant difference? Because as I understood it, what was going on was that there was an existing program administered by Maryland. Part of it was Medicaid, part of it was specific to children, the CHIPS program, and that the money was going to be used to help finance that program. So what's the relevant difference for the purpose of your argument? The relevant difference is that in the Maryland case, the money just went into a general program and was not directed to the employees of the employer. Here the money is going to the city program, but it's being used for the specific employees. Is it the MRA that you're objecting to, not to HAP generally? The employer spending requirements. That's what we're objecting to, the requirement that employers have to pay into that. It requires the employers to enter into the same kind of ongoing relationship with the city, analogous to the insurance company. And, again, it doesn't matter if there's a contract or not, because the Supreme Court has said that if you have the mandate from the state, you can still have the plan that way. And I think it's also dangerous to try to make a distinction between either contractual or agent. I don't understand where there's an agency relationship here either, because usually you just have parties to a different contract when you have that. One's not an agent of the other. They're just on different sides. But, anyhow, if the city's right about its view that you need this employer promise and employer contract, that's an easy way for employers to get out of ERISA, because they can just say, well, we're just doing what someone tells us to do, and, therefore, we're not actually establishing ourselves. We're just doing what we're told. And if that's the law, then... Would it be all right for the city to say we tax all businesses, we have a business tax X amount per year for a health plan? If that is connected with the credit for the employer, that would probably be a problem. So it would be all right to tax them, but not to give them credit? If they gave credit for the specific expenditures they were making, the law would operate like the Maryland law in Fielder. I don't know that the employers would be a lot happier with a tax where they couldn't get credit than with a tax where they could get credit. Well, I'm not saying that they... I'd have to look at the actual tax itself on that. We took no position on that in the brief. What we're saying here is that the city is requiring a lot more than just something that's analogous to a tax here. Well, what they're doing is giving them credit for other payments that they're already making. And it seems to me it's hard to argue that if they could do it without giving them credit, they can't give them the credit. The problem, again, Your Honor, is that if the law is set up like that, the employer is really saying, I've got a choice. Either pay the money to my employees or pay the money to the state. And the rational employer is going to say, I'll pay my employees, which means establishing an ERISA plan as the Fourth Circuit held in Fielder. But could I just make one more point on the plan issue and then go on to the second argument? If the city is right about the city payment program being outside of ERISA, there's no question that employees are not going to be protected by ERISA. And that's a serious concern because the benefits at issue here are not just analogous to payroll practices, as the city say. They say that the risk is really the risk of nonpayment. The risks are serious of not getting paid for medical benefits when you need it. And to determine whether someone's eligible for medical benefits, there has to be discretionary decision-making going on by the doctors, the medical personnel, and then the plan people or the people in whatever program to decide whether there's coverage for it. Now, the Department of Labor has regulations on claims that set forth specific time limits and require explanations in writing, require employees to be given enough information that can know the basis for the decision and how to challenge it. All those things disappear if the city's right on its option. Now, on the second point... And you're arguing that in favor of ERISA? We've got an awful lot of ERISA cases in which the administrator has discretion, which insulates a huge number of their decisions from any judicial review. We're supposed to think that's a good idea? There is discretion there, but here there's nothing for the San Francisco program. And, of course, if San Francisco can do it, so can other state and local governments. On the other issue, the interference, I think it's first important to establish the right test. I'm not sure that the parties here, or at least the city side, has focused on that. The test is what's set out in the Supreme Court's traveler's decision. You first look at the effect not only on plan administration but also on plan sponsorship. The Supreme Court said that, that the goal of ERISA is to protect plans and plan sponsors from laws that interfere with uniformity. And, second, the test does not require an actual conflict. It's only potential conflict. And the potential conflict is not just from the law at issue here. It's from the laws that could be enacted by other states and municipalities. Now, if you apply that test... Is that the argument? It's not, in fact, preemptive. It was something similar enough to what the city was doing so that if the city can do it, so can other states. I don't understand that argument. Do you have to strike down a valid statute because other parties looking at that statute might say that an invalid statute is all right? No, Your Honor. What we're saying is that in determining whether it's valid, the court has to look at the potential impact of what would happen if other states or municipal governments would do the same thing that the court would be allowing the city here to do. Now... Why would it be different if Los Angeles adopted the same ordinance that San Francisco adopted? It would interfere with employers' ability first to sponsor uniform plans. No, no. I'm assuming that we were to say San Francisco is valid. You say we have to be careful in doing that because another entity might adopt the same plan? No, I'm saying in considering before the court even reaches a decision on whether it's valid, the court has to consider what the implications would be if another state or local government did pretty much the same thing, which... But how is that issue different from the issue we have to determine when we decide whether this one is valid? I mean, the fact that if we determine that this one is valid, we're supposed to consider that maybe there'll be two of them or three of them? Yes. And how does that make something that's valid for one invalid for two? That's why I said if it's valid for San Francisco, we have to say, but if Los Angeles did the same thing, it would be invalid? I'll give an example. Maybe that would help. Yes, I'm having trouble with the argument. Just on the plan sponsorship issue, to see whether there's interference, you have to compare what plan sponsors can do right now and with what they would be able to do if the city ordinance is upheld. Right now, ERISA permits employers to decide who's going to be covered by the plan, what level of benefits to pay, and what kind of benefits to pay. If the city ordinance is upheld, the employers and sponsors are going to be subjected to various laws saying that you have to cover this group, and another city or state might say no, cover some other slightly different group. You'll have different benefit levels, different tests for measuring the benefits. The city here, for example, says let's measure benefit levels by the hourly wage. Another state could say, like I think some of them have proposed, let's look at the total payroll and take a percentage of that. Someone else could say, let's look at the average medical payments here. It would be a nightmare for an employer to say, I want uniform plans for my employees, and yet I still have to comply with all these requirements. Yes, but it's very clear that this ordinance does not speak at all to benefits provided. It speaks rather to the amount of money that the employer has to make. And part of your example was, well, maybe in one instance, the ordinance is going to require a certain level of benefits. That's not what this ordinance does. And it's very clear from what we've already written that that was an important distinction that we saw between this ordinance and some others. Your Honor, with respect, I think that the ordinance does require spending, not just on anything but for medical benefits. Of course, but it does not prescribe any particular benefit or any particular level of benefit. It requires only that a certain amount of money be spent. That's true. But once you have that out there, that is going to interfere with an employer's ability to make a different decision on different kinds of benefits to provide, different levels of benefits to provide, different employee groups to cover for that. That's the point I'm making on that. I think we've about run out of time for you. I'm sorry. If the Court has any questions, I'd be happy to answer. Thank you. So the time that shows on the clock is the time that was left before our promise of additional time if necessary. Your Honor, I don't anticipate taking whatever time I actually do have. All right. Even better. Just briefly on the government payment option issue, there's a contention from Mr. Seeger that employers will somehow be able to evade the requirements of ERISA if they are allowed to make payments for health care to the city, thereby allowing the city to provide benefits to those employees at a discount. Congress was not concerned with misconduct by the government when it enacted ERISA in 1974. The implication of Mr. Seeger's argument seems to be that, well, the employer can make a payment to the government, and then the government might break its promises. The government might do something wrong, and therefore somehow the employer has evaded ERISA's requirements. That's not what Congress was concerned with when it enacted ERISA. Everything that Congress did in 1974 shows that it was not concerned with government misconduct. It was concerned with employer misconduct. And here, of course, from the perspective of the employer, it is like a payroll practice because the employer simply figures out who qualifies and then makes a payment, and the employer is done. There's no further risk. On the uniformity point, assuming the fielder is correct. Well, again, an employee can avoid all of the problems of ERISA just by not entering into a plan if it wants. That's right. And I can do the same thing by not providing the plan but making the payment to the city. And as a question. The employer has complete freedom under ERISA to provide plans or not. The law, as I understand, is only that if it does establish a plan, then it has to do it in particular ways where it doesn't break its promises. And then local governments can't interfere with those plans. And that's right, Your Honor, and Fort Halifax exemplifies that. An employer can make a decision to provide severance benefits to an employee. Even though severance benefits are mentioned in ERISA, an employer can do so without creating an ERISA plan. And the court there explicitly rejected the argument that by the Department of Labor and others that construing the arrangement in that case as something other than an ERISA plan would allow employers to evade the requirements of ERISA. The point is, if there's no plan, there are no ERISA requirements, and an employer is free to conduct itself outside the rules of ERISA. On the uniformity point, assuming the fielder is correct, and assuming that the HCSO is valid, we have a rule that's very clear and very consistent with existing ERISA preemption precedent. A local government cannot force an employer to adopt an ERISA plan or change an ERISA plan. However, a local government can impose an expenditure mandate if the employer can comply with the mandate without disturbing plan uniformity. And again, despite hundreds of pages of briefing from the other side, they have not been able to show how plan uniformity would be disturbed by this ordinance. With that, unless the court has further questions, we are prepared to rest.  Thank you, Your Honor. All right, thank you very much, both sides. And we'll take the case under submission, and the court will stand in recess for the day.
judges: Goodwin, Reinhardt, Fletcher